**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2010 AUG -2  PM 2: 57

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| Edward Dominguez, Edwin Dominguez, and Lizangela Dominguez | * | DOCKET NO. |
| | * | |
| | * | |
| versus | * | |
| | * | |
| Liberty Insurance Corporation, | * | **10-2416** |
| Lexington Insurance Company, | * | |
| Westchester Surplus Lines Insurance Company, | * | |
| Arch Specialty Insurance Company, | * | **SECT. N MAG. 5** |
| Shaw Enterprises, Inc. | * | |
| and | * | |
| United States of America through the | * | |
| Federal Emergency Management Agency | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### AMENDED COMPLAINT FOR DAMAGES

This Amended Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), through undersigned counsel, respectfully represents that:

### I.  PARTIES

1. Each Named Plaintiffs is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Defendants pursuant to the Louisiana Direct Action Statute include:

   a. Upon information and belief, Defendant Liberty Insurance Corporation, also known as Liberty Mutual Insurance Corporation, (hereinafter, "Liberty"), is, upon information and belief, an entity incorporated in the state of Massachusetts, with

___Fee _____
___Process _____
_x_ Dktd _____
___CtRmDep _____
___Doc. No._____

its principle place of business in the state of Massachusetts, licensed to do business in the State of Louisiana and in good standing. Further, defendant Liberty provided insurance coverage for the risks involved herein of R-Vision, Inc. (hereinafter, "R-Vision"), which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Louisiana. Plaintiff the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

b.   Lexington Insurance Company, (hereafter, "Lexington"), is, upon information and belief, a corporation organized under the laws of the State of Delaware, with its principle place of business in Massachusetts.  Further, Plaintiff avers that defendant Lexington had in full force and effect a policy of liability insurance affording coverage to R-Vision with respect to the matters, risks and things for which R-Vision is liable herein, thereby affording Plaintiff the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

c.   Arch Specialty Insurance Company (hereafter, "Arch") is, upon information and belief, a corporation organized under the laws of the State of Nebraska, with its principle place of business in New Jersey.  Further, Plaintiff avers that defendant had in full force and effect a policy of liability insurance affording coverage to R-Vision with respect to the matters, risks and things for which R-Vision is liable herein, thereby affording Plaintiff the right to proceed against this defendant insurer under the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

3. The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

4. Shaw Environmental, Inc. ("Shaw"), a Louisiana corporation, received a No-Bid contract from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, et seq.

6. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

7. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

9. R-Vision's insurer is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district

and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

10. Shaw is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Louisiana and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Louisiana with respect to the activities and claims which are the subject of this litigation.

11. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

### III. FACTS AND GENERAL ALLEGATIONS

12. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Louisiana were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

13. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). See Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, available at http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

14. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. Id.

15. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by R-Vision's acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. Id.

16. The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

17. FEMA contracted with the Manufacturer to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

18. On information and belief, Manufacturer expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

19. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

5

20. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

21. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to R-Vision's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that R-Vision failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

22. Named Plaintiffs submit that R-Vision ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to R-Vision's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell R-Vision's products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

23. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by R-Vision and provided to Plaintiffs by the Federal

6

Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

24. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.  Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air.  Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer.  Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.


If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

See 24 C.F.R. §3280.309.

25. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on

Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

26. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

27. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2)

8

Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". See 24 C.F.R. §3280.308.

28. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. See 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

See Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, FEMA Exposes Gulf Coast Residents to Formaldehyde, Updated on Dec 19, 2007, available at http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

29. R-Vision knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

30. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

31. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Shaw with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the Shaw to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

32. Shaw was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

33. Under the terms of their contracts, Shaw was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, Shaw was

10

obligated to advise and instruct FEMA regarding the implementation of those contracts. Shaw failed to properly fulfill either of these tasks.

34. Shaw contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Shaw was tasked with operating. These new areas included staging areas to be managed and maintained as assigned to one of Shaw or individual locations and addresses where Shaw assigned that temporary housing unit would have obligations to manage and maintain it.

35. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Shaw entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

36. Shaw were tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Shaw knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

37. Once the temporary housing unit(s) occupied by the plaintiff(s) were transported and delivered to a particular location, Shaw had the responsibility for installing that temporary housing unit. Shaw installed the temporary housing units by "blocking" the unit. This meant raising the plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

38. By blocking the temporary housing unit(s) of each plaintiff, Shaw created stress and flexing on the frames of the unit as it were not designed to be lifted off of the wheel base.

11

In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

39. The stress and flexing of temporary housing units' frames caused by Shaw "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

40. The temporary housing unit(s) occupied by the plaintiff(s) which were provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Shaw knowingly and intentionally modified the design and the actual use of these units occupied by the plaintiff(s) by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

41. Shaw failed to consult with the manufacturers of the temporary housing units, including R-Vision, with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation. Shaw took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

42. Once the Shaw had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the plaintiff(s), Shaw was tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the plaintiff(s). Upon information and belief, Shaw failed to adequately inspect the temporary housing units occupied by the plaintiff(s) to ensure that the units were safe and suitable for their

intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

43. In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the plaintiff(s) provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by one of Shaw, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Shaw failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the plaintiff(s).

44. Parallel to their duty to manage, maintain and repair each temporary housing unit Shaw failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiff-occupant(s) of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

45. Following the plaintiffs' occupancy of each temporary housing unit, Shaw was tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Shaw failed to identify the unsuitability of the temporary housing units for long-term occupancy.

46. In addition to de-installation of the temporary housing units, Shaw was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing these temporary housing units, Shaw warranted that the units were fit for

13

their intended use, long term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, Shaw created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

47. Shaw, at every stage of their involvement, failed to warn the plaintiff-occupant(s) of each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the plaintiffs.

48. Through their actions and omissions, Shaw created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Shaw  negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

49. Shaw failed to warn the occupants of  temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

50. By restoring and refurbishing the trailer for future habitation, Shaw improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

51. Finally, despite these failures, Shaw received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the plaintiff-occupant(s) of the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

52. The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.   See Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, available at http://oversight.house.gov/documents/20070719131219.pdf.

53. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

54. In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  See Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

55. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs.  See Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, available at http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

56. The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006 .

57. The Federal Government continued to  supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which

16

reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, supra.

58. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.   Union of Concerned Scientists, supra, and Exhibits B (available at http://oversight.house.gov/documents/20070719113015.pdf)    and   D   (available   at http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

59. The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, supra, and Exhibits E (available at http://oversight.house.gov/documents/20070719113322.pdf), I (available at http://oversight.house.gov/documents/20070719113515.pdf)   and   M   (available   at http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

60. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel

(OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, supra, and Supplemental A (various emails available at http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails available at http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

61. Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

62. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst

possible light.  Union of Concerned Scientists, supra, and Exhibit R (various emails available at http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

63. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents.  This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge,  Louisiana.  Union of Concerned Scientists, and Exhibit R attached thereto, supra.  See also Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry,          Feb          1,          2007,          available athttp://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

64. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.  Union of Concerned Scientists, supra.

65. FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde.   FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints

19

from trailer residents concerning formaldehyde fumes in 2006.  See correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

66. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  See correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

67. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average sampling results still were higher.  See THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS,

Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, available at http://oversight.house.gov/documents/20070719102502.pdf.

68. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics."  Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, available at http://oversight.house.gov/documents/20071114164004.pdf.

69. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

70. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation"did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions."  See An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-

Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, available at http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

71. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

72. It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  See Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

73. The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer

housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  Id. at 4.

74. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  Id. at 5-6, 11.

75. As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

76. The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions

23

which involve decisions grounded in social, economic, or political policy.   Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

77. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

## COUNT 1:

## CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

78. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

79. The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

80. The Federal Government, after becoming aware of the potential for such harm, violated this duty to each Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

81. As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

82. Further, since each Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence per se.

83. The Federal Government was negligent and at fault in the following non-exclusive particulars:

   a.   In failing to warn the each of the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied

   b.   In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

   c.   In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of each Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.

   d.   Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT 2:**

**CAUSE OF ACTION AGAINST THE MANUFACTURER UNDER
LOUISIANA PRODUCTS LIABILITY ACT**

97. R-Vision is a manufacturer of each of the housing units occupied by the Named Plaintiffs, which units constitute products under the Louisiana Products Liability Act [LPLA].

98. The exposure to each Named Plaintiff to formaldehyde fumes from R-Vision's products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which R-Vision sold these housing units.

99. The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to each Named Plaintiff.

100. Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to each Named Plaintiff.

101. R-Vision's product, equipment and supplies used by each Named Plaintiff were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left R-Vision's control. Each Named Plaintiff was an intended and foreseeable user of the alleged defective products and damages and losses to each Named Plaintiff reasonably could have been anticipated by R-Vision.

102. The defects in R-Vision's housing units are the result of and/or include, but are not limited to, the following:

i.     In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

ii.     In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii.     In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

iv.     In providing housing units which did not conform to the express warranties made by the R-Vision regarding their fitness for use as reasonably anticipated;

v.     In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi.     In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.     In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the housing unit occupied by the Plaintiff, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the

hazards associated with the excess levels of emissions of formaldehyde in the unit.

viii.    In failing to ensure that the housing units it manufactured and provided to each Named Plaintiff were suitable for their intended use;

ix.    In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

x.    In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

xi.    Such other indicia of fault under the LPLA  as will be shown at the trial of this matter

## COUNT 3:

## NO-BID DEFENDANTS UNDER THE LOUISIANA PRODUCTS LIABILITY ACT

103. Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

104. Shaw qualifies as manufacturers under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing units constitute products under the LPLA.

105. The increased exposure to formaldehyde fumes from the alteration of the temporary housing units by Shaw resulted from the normal, foreseeable, and intended use of the products and equipment.

106. The installation and alteration of the temporary housing units, the modifications to the manufacturers' designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to each Named Plaintiff.

107. Each Named Plaintiff was an intended and foreseeable users of the alleged defective products, and damages and losses to each Named Plaintiff reasonably could have been anticipated by Shaw.

108. Shaw, by installing the temporary housing units on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the units.

109. The defects in Shaw product are the result of and/or include, but are not limited to the following:

   a. In creating stress and flexing on the frames of the units by lifting significant weight from the wheel base, which distorted the travel trailers' shells allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

b. In providing temporary housing units to the each Named Plaintiff which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

c. In providing temporary housing units to each Named Plaintiff which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

d. In failing to warn each Named Plaintiff of the unreasonably dangerous nature of the travel trailer(s) converted to temporary housing units for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

e. In failure to ensure that the temporary housing units they installed, refurbished, and reconditioned were suitable for their intended use, as long term housing;

f. In failing to adhere to any and all of the warning against the jacking of the units with weight off their wheel base by the manufacturers;

g. In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing units;

h. In providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

i. Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

## COUNT 4:
## NEGLIGENCE OF NO-BID DEFENDANTS UNDER LOUISIANA LAW

110. Each Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

111. At all relevant times Shaw was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and

restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

112. Shaw owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

113. Shaw knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each plaintiff, and that the temporary housing units would be used in the manner that each plaintiff herein used the temporary housing units.

114. Shaw breached their duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a.   Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy;

b.   Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

115. Shaw actions were the proximate cause of the increased exposure of formaldehyde to the each Named Plaintiff.

116. Shaw contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

31

**COMPENSATORY DAMAGES**

117. In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, the United States of America through FEMA and R-Vision, as well as Shaw, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

118. The damages sought herein by Named Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Named Plaintiffs in wrongful death and survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

**REQUEST FOR JURY TRIAL**

Each Named Plaintiff is entitled to and demands a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Named Plaintiffs pray that R-Vision, Shaw, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a.    past and future physical injuries,

   b.    past and future mental and physical pain and suffering,

   c.    past and future physical impairments and disability,

   d.    past and future reasonable and necessary medical expenses,

   e.    past and future loss of earning capacity,

33

      f.     past and future loss of enjoyment and quality of life,

      g.     loss of consortium and/or society,

      h.     compensable out-of-pocket expenses related to defendants' wrongdoing, and

      i.     costs of court,

3.     all other general, equitable, and further relief as the Court may deem just and proper.

By: _____

Daniel E. Becnel, Jr. (La. Bar #2926)
Matthew B. Moreland  (La. Bar No. 24567)
**BECNEL LAW FIRM, LLC**
106 W. Seventh Street
P. O. Drawer H
Reserve, Louisiana  70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6445

| **Plaintiff** | **Original Complaint** |
|---|---|
| 1.  Edward Dominguez | 09-7940 |
| 2.  Edwin Dominguez | 09-5341 |
| 3.  Lizangela Dominguez | 09-5343 |